UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| LAWRENCE OUELLETTE, )<br>)<br>Plaintiff )<br>)    Civil Action No. 2:16-cv-53<br>v. )<br>)<br>NORMAN GAUDETTE, ROGER )<br>BEAUPRE and CITY OF )<br>BIDDEFORD, )<br>)<br>Defendants. ) | |

### CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

Defendants Roger Beaupre and City of Biddeford ("City Defendants") move for summary judgment on Plaintiff Lawrence Ouellette's 42 U.S.C. § 1983 claims against them on four grounds.  First, Ouellette's claims are time-barred.  Second, the claims fail because the underlying conduct Ouellette alleges (sexual abuse by Officer Norman Gaudette) was not undertaken under color of state law.  Third, there is no evidence that the City Defendants did anything to violate Ouellette's constitutional rights.  Fourth, and at a minimum, the claim against Chief Beaupre, who has been sued in his individual capacity, should be dismissed under the doctrine of qualified immunity.

      **I.**      **Ouellette's claims are barred by the statute of limitations.**

The First Circuit has made clear that "the Maine six-year statute of limitations, 14 M.R.S.A. § 752, is the appropriate one to be used for section 1983 cases in the state of Maine." *Small v. Inhabitants of City of Belfast*, 796 F.2d 544, 546 (1st Cir. 1986); *see also Douglas v. York County*, 433 F.3d 143, 144 (1st Cir. 2005) ("Since there is no federal statute of limitations

1

for federal civil rights actions, courts look to the state limitations period for personal injury actions. The Maine statute of limitations for personal injury actions is six years.") (citation omitted); *Wilson v. Garcia*, 471 U.S. 261, 275 (1985) (reading 42 U.S.C. § 1983 "as a directive to select, in each State, the one most appropriate statute of limitations for all § 1983 claims.").

Ouellette claims he was sexually abused by Gaudette starting in the spring of 1987. Under the six-year statute of limitations for section 1983 actions in Maine, Ouellette had until 1995—six years after he turned 18 on June 5, 1989 (City Defendant's Statement of Material Facts ("SMF") ¶ 1)—to file his complaint. *See* 14 M.R.S. § 853 (tolling the statute of limitations until Ouellette turned 18). His 2016 complaint is therefore time-barred, unless he can find a way around the six-year statute of limitations. As explained below, he cannot do so.

### A. The statute of limitations was not tolled by the discovery rule.

According to the Complaint, "Ouellette first discovered the involvement of Chief Beaupre and the City sometime in 2014-15 during the preliminary investigations into the claims made in this Complaint." (Am. Compl. ¶ 25.) But "[t]he accrual period for a Section 1983 action begins when the plaintiff knows *or has reason to know* of the injury which is the basis of the action." *Id*. (quotation marks omitted) (emphasis added). A plaintiff who knows he has been injured cannot "sit back, without further investigation, and permit the statutory period to lapse," but must instead "exercise . . . reasonable diligence" to "discover[] the full extent of his injury" within the statutory period. *Marrapese v. State of R.I.*, 749 F.2d 934, 944 (1st Cir. 1984); *see also id*. at 938 (a plaintiff who knows he has a civil rights claim has "a duty to exercise reasonable diligence to investigate and perfect his rights within the three years the statute allowed him following the wrongful conduct.").

"The discovery rule incorporates an objective standard," so that "[t]o delay commencement of the running of the statute of limitations, 'the factual basis for the cause of action must have been *inherently unknowable* [that is, *not capable of detection through the exercise of reasonable diligence*] at the time of injury.'" *Sanchez v. United States*, 740 F.3d 47, 52 (1st Cir. 2014) (brackets in original) (emphasis added). Simply put, "a § 1983 claim accrues when a plaintiff knows or has reason to know of his injury." *Poy v. Boutselis*, 352 F.3d 479, 483 (1st Cir. 2003). Accrual is delayed by the discovery rule only if "the factual basis for the cause of action" was, not just unknown to the plaintiff, but 'inherently unknowable'" (*Attallah v. United States*, 955 F.2d 776, 780 (1st Cir. 1992))—or "incapable of detection by the wronged party through the exercise of reasonable diligence." *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 376 (1st Cir. 1991) (quotation marks omitted). "The question of when a cause of action accrued is a matter of federal law." *Street v. Vose*, 936 F.2d 38, 40 (1st Cir. 1991).

Ouellette does not claim to have repressed the memory of the alleged sexual abuse by Gaudette in the 1980s. On the contrary, he told people about his alleged abuse by Gaudette as early as 1990 or before. *See* SMF ¶¶ 36-64. While Ouellette claims to have "first discovered the involvement of Chief Beaupre and the City sometime in 2014-15 during the preliminary investigations into the claims made in this Complaint" (Am. Compl. ¶ 25), Ouellette has known that he was injured by Gaudette since the abuse alleged in the complaint happened; he does not claim to have repressed his memory of the abuse. And he has had reason to suspect that the City and Beaupre—Gaudette's employer and boss—might have played a role in his abuse since it happened. When Ouellette turned 18 in 1989 he "possessed knowledge of the facts underlying his cause of action sufficient to put him on inquiry notice" that he had a claim against Gaudette, and that he might have a claim against Gaudette's employer. *Marrapese*, 749 F.2d at 937. The

factual basis for Ouellette's claims against Beaupre and the City was not "inherently unknowable"—instead, it was readily "capable of detection through the exercise of reasonable diligence." *Sanchez*, 740 F.3d at 52. Ouellette points to no new information he acquired in the six years before he filed this lawsuit that caused him to realize that he had a claim against the City and Beaupre, but that had been inherently unknowable and incapable of detection before then. He therefore cannot now invoke the discovery rule to justify his decades-long delay in filing this lawsuit. *See id*.

The First Circuit has declared that "[o]nce a plaintiff knows of the injury and its probable cause, he/she bears the responsibility of inquiring among the medical and legal communities about whether he/she was wronged and should take legal action." *Sanchez*, 740 F.3d at 52 (quotation marks omitted). Ouellette knew of his alleged injury when he turned 18 in 1989, and of its probable and potential causes. At that point he bore the responsibility of inquiring among "legal communities about whether he . . . was wronged and should take legal action." *Id*. Ouellette's failure to investigate a known injury with reasonable diligence and to file a timely claim when he could have done so defeats his argument for tolling under the discovery rule. *See A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 141-42 (2nd Cir. 2011) ("An accrual date that turns on when a plaintiff (or his lawyers) finally decides to take action, rather than when the plaintiff was sufficiently alerted to the appropriateness of seeking legal advice, would render the limitations period meaningless.").

In *Duncan v. Oregon*, 2007 WL 789433 (D. Ore. Mar. 14, 2007), plaintiffs who had alleged sexual abuse by an employee of the Oregon Youth Authority sued the employee and certain "State Defendants" for failing to prevent the abuse. Like Ouellette, the *Duncan* plaintiffs sought to invoke the federal discovery rule with respect to the State Defendants, arguing that

their "policy of failing to investigate and discipline [the abuser] is separate from the sexual abuse . . . ." *Id*. at *4. Like Ouellette, the *Duncan* plaintiffs argued that their "awareness of the sexual abuse does not impute knowledge of the claims against State Defendants" for failing to discover or prevent the abuse. *Id*. ("Plaintiffs contend that State Defendants had a policy of failing to investigate and supervise Boyles [the abuser] and failing to keep records of complaints against him, thus hiding the information from plaintiffs. This policy did not come to light due to State Defendants' efforts to hide it . . . .").

The *Duncan* court rejected the argument that the plaintiffs' cause of action against the State Defendants had not accrued under the federal discovery rule until they found out about the specific ways the State Defendants had failed to discover or prevent their injuries:

> I agree with plaintiffs that State Defendants' policy of failing to investigate and discipline Boyles involves a separate legal interest than the sexual abuse committed by Boyles. The damage to plaintiffs, however, occurred when they were sexually abused. They were not further damaged if State Defendants covered up their knowledge of Boyles' misconduct with others or if State Defendants failed to act to protect plaintiffs. The sexual abuse is the injury which is the basis for both the cause of action against Boyles and the cause of action against State Defendants. All plaintiffs remember the abuse, none had repressed memories. They knew they were abused and they knew Boyles was a state employee. I sympathize with plaintiffs' arguments that they had no one to turn to for help because Boyles ruled their lives. Plaintiffs, however, could have spoken to teachers, counselors, foster parents, judicial officers, or medical personnel.

*Id*. *6. Likewise in *Plumeau v. Sch. Dist. No. 40 County of Yamhill*, the Ninth Circuit held:

> A plaintiff has a duty to use due diligence in an effort to discover the party responsible for her injury. The Plumeaus knew the abuse took place during school hours and on school property and that the abuser was a school district employee. We agree with the district court that these facts were sufficient to apprise the Plumeaus of their potential claims against the district for failure to supervise [school district employee/abuser] Moore.

130 F.3d 432, 437 (9th Cir. 1997) (citation omitted). This Court should reject Ouellette's attempt to invoke the discovery rule where he knew about his alleged injury and could—with the exercise of due diligence—have discovered, decades before he did, the basis for his claim that

5

the City Defendants contributed to his injuries.

### B. Ouellette's claims against the City and Beaupre are time-barred because his underlying claim against Gaudette is time-barred.

Ouellette's section 1983 claim against the City and Beaupre is time-barred for yet another reason: his underlying section 1983 claim against Gaudette is time-barred, and the First Circuit has held that where a section 1983 claim against a police officer is barred by the statute of limitations, a plaintiff's supervisory and municipal liability claims against the police chief and the municipality based on the conduct of that police officer "also must fail." *Nieves v. McSweeney*, 241 F.3d 46, 50 (1st Cir. 2001).

Ouellette's section 1983 claim against Gaudette is barred by the statute of limitations for the same reason his claim against the City Defendants is barred: the alleged abuse happened in the 1980s (Am. Compl. ¶ 1), and Ouellette does not claim that he did not know he was being abused at the time the abuse happened, or that he repressed the memory of the abuse. Here as in *Nieves*, because the section 1983 claim against the police officer accused of violating the constitutional rights of the plaintiff is barred by the statute of limitations, so are the section 1983 claims against the City and Chief Beaupre based on the same underlying conduct. 241 F.3d at 50; *see also Evans v. Avery*, 100 F.3d 1033, 1039 (1st Cir. 1996) (section 1983 claim against the City of Boston could not succeed because the plaintiff's claim against the police officer defendants accused of committing the underlying constitutional violations was not viable); *Spencer v. Roche*, 659 F.3d 142, 150 (1st Cir. 2011) ("[T]he absence of an anchoring constitutional violation dooms the claim that the City failed properly to train the officers.").

### II. Gaudette was not acting under color of state law.

"There are two essential elements of an action under section 1983: (i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a

denial of rights secured by the Constitution or laws of the United States." *Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir. 1995) (quotation marks omitted). The "under color of state law" requirement goes to the heart of the statute's purpose, as "[t]he central aim of the Civil Rights Act [section 1983] was to provide protection to those persons wronged by the [m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Owen v. City of Indep., Mo.*, 445 U.S. 622, 650 (1980) (quotation marks omitted); *see also Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights . . . ") The under-color-of-law requirement is "a jurisdictional requisite for a § 1983 action . . . ." *Polk County v. Dodson*, 454 U.S. 312, 315 (1981). In short, for a plaintiff to prevail on a section 1983 action the conduct complained of must be "fairly attributable to the State[.]" *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quotation marks omitted).

      The First Circuit has made clear that "section 1983 is not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved in that way but for the authority of his office." *Martinez*, 54 F.3d at 986. For a defendant to have acted under color of state law requires that they "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id*. (quotation marks omitted). "Hence, a person acts under color of state law when he abuses the position given to him by the State." *Id*. (quotation marks omitted). "The key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law." *Id*. Of crucial importance here, "the acts of state officials 'in the ambit of their personal pursuits' are not state action." *Id*. (quoting *Screws v. United States*, 325 U.S. 91, 111

7

(1945)). That being so, "a policeman's private conduct, outside the line of duty and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." *Id*. at 986-87; *see also id*. at 987 ("Even though 'acting under color of law' includes 'acting under pretense of law' . . . , there can be no pretense if the challenged conduct is not related in some meaningful way either to the officer's governmental status or to the performance of his duties."). Even "statements by individuals that they are entitled to a special privilege because of their official status do not constitute action under color or pretense of state law if the asserted privilege lies clearly outside the scope of their official duties." *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445, 450 (1st Cir. 1997).

The question, then, is this: if Gaudette committed the acts Ouellette claims he committed, was he "engaged in purely personal pursuits," or was he "acting under color of state law"? *Id*. at 987. The evidence in the summary judgment record supports only one conclusion: Gaudette was engaged in purely personal pursuits and was not acting in his official capacity.

Gaudette was a member of the Biddeford Police Department from 1973 to 2000. (SMF ¶ 9.) Ouellette worked for "Twin City Cleaning," a commercial cleaning business run by Gaudette and his wife. *Id*. ¶ 13, 17. Ouellette alleges that in the late summer and fall of 1987 and through the fall of 1988 Gaudette performed oral sex on Ouellette more than twenty times, most often in exchange for money. *Id*. ¶¶ 18-24. One such incident took place in KeyBank in Old Orchard Beach, Maine (*id*. ¶ 21); another common location was Ouellette's mother's house. *Id*. ¶ 22. In May of 1988[1] Gaudette took Ouellette to a campground in Naples, Maine, in his

---

[1] Elsewhere in his deposition Ouellette put the Naples camping trip in 1987, but in a 1990 interview with Michael Pulire of the Maine Attorney General's Office he indicated that he and Gaudette "started going alone on camping trips in the Summer of 1988 when Larry was 17 years old." SMF ¶ 25 & 45. When asked at his deposition whether, given that the 1990 interview was much closer in time to the incident in question than the 2016 deposition taken two-and-a-half decades later, "if in the interview with the

pickup truck with an attached expandable camper, where Gaudette allegedly gave Ouellette liquor and sexually assaulted him. *Id*. ¶¶ 25-30.

None of the incidents of alleged sexual abuse had any connection to Gaudette's status as a police officer. Gaudette did not use Biddeford Police Department crime reports or databases to access the names of minors for the purpose of targeting them for sexual activity. He never used equipment owned by the City of Biddeford or the Biddeford Police Department to contact any person to engage in a sexual act. According to Ouellette, all of the alleged acts of sexual abuse occurred while Gaudette was off duty either on personal camping trips, working for Twin City Cleaners, or at Ouellette's mother's house. *Id*. ¶ 159. According to Ouellette, none of the alleged acts of sexual abuse were the result of physical intimidation by Gaudette. *Id*. ¶ 160. There is no evidence that Gaudette did anything that suggested a connection between his personal conduct with Ouellette and his status as a police officer. Ouellette therefore cannot prove that Gaudette acted under color of state law, and that the City Defendants are responsible for his actions.

It is not enough that Ouellette knew Gaudette was a police officer, nor would it even be enough if Gaudette had been in uniform or used his police car in connection with the abuse. In *Martinez v. Colon*, the First Circuit held that an on-duty police officer did not act under color of state law when, on duty and in uniform, he shot another officer with his police revolver. 54 F.3d 980, 987-88 (1st Cir. 1995). The Court so held because at the time of the shooting the officer was not performing official duties, but instead was "on a singularly personal frolic: tormenting an acquaintance." *Id*. at 987. The court explained that, "[t]hough on duty and in uniform, [the officer's] status as a police officer simply did not enter into his benighted harassment of his

---

Attorney General's Office investigator you indicated that the camping trips happened in 1988, that's the better date, right?", Ouellette answered: "Yes." *Id*. (*see* Ouellette Depo, 137:5-8.)

fellow officer.  Hazing of this sort, though reprehensible, is not action under color or pretense of law."  *Id.*; *see also id.* at 988 ("[P]laintiff has not produced any evidence tending to show that his tormentor, when brandishing the firearm, was exercising or purporting to exercise police power.  In the absence of any additional indicia of state action, we believe that the unauthorized use of a government-issue weapon is too attenuated a link to hold together a section 1983 claim.") (footnote omitted).  Likewise here, what Ouellette claims Gaudette did was personal conduct engaged in by Gaudette outside the scope of his official duties that cannot support a section 1983 claim.

In *Roe v. Humke*, 128 F.3d 1213, 1214 (8th Cir. 1997), the police officer defendant "met eleven-year-old Jane Doe in 1994 while sitting outside the school in his patrol car and in uniform.  Humke was regularly at the school as part of his duties . . . .  He bought her candy and sodas and gave her a pen set for Christmas.  While he was driving around town in his patrol car, he would drive to Doe's house and talk to Doe from the car.  Humke hugged and kissed Doe through the window of the patrol car . . . ."  *Id.* at 1214.  Despite all that, the court held that the officer was not acting under color of state law when he subsequently "took Doe to his farm for his own personal pursuits, not for any purpose legitimately or purportedly related to the exercise of his responsibilities as a police officer," and sexually abused her, because "there was no nexus between his position as a police officer and his abuse of Doe on the day in question."  *Id.* at 1216, 1218; *see also id.* at 1217 (rejecting argument that, "had Humke not been a police officer, the actions of a relative stranger [to Doe] . . . would not have been tolerated," and rejecting argument that "Humke's credibility was enhanced by virtue of his position as a police officer," because "the knowledge of Humke's status alone by Doe and her parents is not sufficient to convert [his] actions . . . in the pursuit of his private interests into action taken under color of

state law."). The same is true here: while Ouellette may have known that Gaudette was a police officer, Gaudette's alleged acts against him constitute "personal pursuits" that were not undertaken "for any purpose legitimately or purportedly related to the exercise of his responsibilities as a police officer."

Numerous courts have found that police officers were not acting under color of state law because there was an insufficient connection between their misconduct and their official status or duties. *See Halwani v. Galli*, 2000 WL 968219, at *3 (E.D. Pa. July 13, 2000) (on-duty, uniformed police officer did not act under color of law because the incident at issue was "one of a personal nature" and the officer "did not utilize state authority" or "threaten to arrest" the plaintiff); *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445, 450-51 (1st Cir. 1997) (police officer on medical leave was not acting under color of state law when he displayed his identification, told patrons he was there to keep the peace, and then shot and killed a patron during bar fight); *Almand v. DeKalb County*, 103 F.3d 1510, 1514 (11th Cir. 1997) (police officer was not acting under color of state law when he forcibly reentered plaintiff's apartment and raped her, despite the fact that he had "initially gained entry to [the] apartment on the pretense of discussing police business"); *Haines v. Fisher,* 82 F.3d 1503, 1508 (10th Cir. 1996) (on-duty police officers who staged a robbery of a convenience store as a practical joke did not act under color of law because they did not use state authority to execute their plan); *Johnson v. Hackett*, 284 F. Supp.933, 937 (E.D. Pa 1968) ("It is not alleged that the offer to fight was in any way related to the performance of police duties."). Here too, the nexus between Gaudette's alleged sexual conduct toward Ouellette and his position as a police officer that would be required to support a section 1983 claim is nowhere to be found.

11

Because Gaudette was not acting under color of state law, he did not violate Ouellette's constitutional rights. In the absence of an underlying constitutional violation, Ouellette's section 1983 claims against the City and Beaupre must also fail. *See Ramirez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 19 (1st Cir. 2014) ("There are a number of clear rules governing supervisory liability under § 1983. First, the subordinate's behavior must have caused a constitutional violation . . . .").

### III. There is no evidence that the City or Beaupre violated Ouellette's constitutional rights.

Even if Ouellette could prove an underlying constitutional violation by Gaudette, his section 1983 claims against the City Defendants would still fail, because there is no evidence that the First Circuit's stringent requirements for supervisory liability under section 1983 are met. The First Circuit has made clear that "the tort theory of respondeat superior does not allow imposition of supervisory liability under § 1983." *Ramirez-Lluveras*, 759 F.3d at 19. "Proof that the supervisors were negligent is also insufficient." *Id*. "Further, § 1983 liability cannot rest solely on a defendant's position of authority." *Id*.

Instead, it is necessary to show "a strong causal connection between the supervisor's conduct and the constitutional violation." *Id*. "[A] supervisor may not be held liable for the constitutional violations committed by his or her subordinates, unless there is an *affirmative link* between the behavior of a subordinate and the action or inaction of his supervisor ... such that the supervisor's conduct *led inexorably to the constitutional violation*." *Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 533 (1st Cir. 2011) (emphasis added) (quotation marks omitted) (omissions in original). "In addition, the supervisor must have notice of the unconstitutional condition said to lead to the claim." *Ramirez-Lluveras*, 759 F.3d at 20. "A plaintiff may prove causation by showing a known history of widespread abuse sufficient to alert a supervisor to

ongoing violations." *Id*. at 20 (quotation marks omitted).  "However, proof of that sort must truly show widespread abuse; isolated instances of unconstitutional activity ordinarily are insufficient ... to show deliberate indifference." *Id*. (omission in original) (quotation marks omitted).  The First Circuit has "formulated the deliberate indifference inquiry as a three-part test that requires plaintiffs to show: (1) that the officials had knowledge of facts, from which (2) the official[s] can draw the inference (3) that a substantial risk of serious harm exists." *Id*. (quotation marks omitted).

There is no evidence that, when the sexual abuse at issue in this case is alleged to have happened, either Beaupre or the City was on notice that Gaudette was violating Ouellette's constitutional rights—let alone notice of "a known history of widespread abuse"—or that Beaupre or the City did anything that "led inexorably" to the violation of Ouellette's constitutional rights, or did anything that had a "strong causal connection" to the violation of Ouellette's constitutional rights.  While the Complaint offers conclusory allegations that Beaupre "was given information prior to Larry Ouellette's abuse such that he was aware of and/or should have been aware that Norman Gaudette and at least one other Biddeford police officer had been and were sexually abusing young boys" (Am. Compl. ¶ 1), and that Beaupre "turned a blind eye and failed to prevent the abuse" (*id*.), there is no actual evidence in the summary judgment record to support these conclusory claims.  Nor is there evidence to support the claim that, at or before the time Ouellette was abused, Beaupre engaged in "actions and/or inactions" that "were affirmatively linked to Gaudette's violation of Ouellette's constitutional rights." *Id*. ¶ 37.  There is simply no evidence that during the years at issue anything happened "to put [Gaudette's] supervisors on notice that he presented a substantial, unusually serious, or grave risk" of abusing Ouellette.  *Ramirez-Lluveras*, 759 F.3d at 21.

14160293.1

Although the First Circuit has declined to "recast the contours of supervisory liability in the aftermath of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)" (*Ramirez-Lluveras*, 759 F.3d at 19), in the event that the Court does not agree that Ouellette has failed to provide evidentiary support for his supervisory liability claim under the standard articulated in *Ramirez-Lluveras,* it should grant summary judgment for the City Defendants under *Iqbal*, where the Supreme Court held that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution."  556 U.S. at 676 (emphasis added); *see also id.* at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").  As just explained, there is no evidence that Beaupre, through his own individual actions, violated Ouellette's constitutional rights.  Likewise, there is absolutely no evidence that any City of Biddeford municipal official violated Ouellette's constitutional rights.  *See Ruiz-Rosa v. Rullan*, 485 F.3d 150, 157 (1st Cir. 2007) ("While proof of deliberate indifference . . . does not require evidence that the officials were aware of the risk of a specific harm, the plaintiff must show that the officials had knowledge of facts from which the official[s] can draw the inference that a substantial risk of serious harm exists.") (quotation marks omitted).

IV. **Beaupre is entitled to qualified immunity.**

"The general rule of qualified immunity is intended to provide government officials with the ability reasonably [to] anticipate when their conduct may give rise to liability for damages." *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (quotation marks omitted).  "Officials are entitled to qualified immunity unless (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right and (2) the right at issue was clearly established at the time of [their] alleged misconduct."  *Walden v. City of Providence, R.I.*, 596 F.3d 38, 52 (1st Cir. 2010)

(quotation marks omitted).  The second prong has "two aspects. The first is whether, based on the clarity of the law at the time of the alleged civil rights violation, [t]he contours of the right . . . [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. (alterations in original).  "The second aspect is whether, based on the facts of the particular case, a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Id.* (quotation marks omitted).  "Summary judgment should be granted if the defendant official can establish as a matter of law that a reasonable official in her position would have believed that her conduct did not violate clearly established law." *Bowen v. City of Manchester*, 966 F.2d 13, 16 (1st Cir. 1992).  As summarized by the First Circuit: "Qualified immunity generally protects all but the plainly incompetent or those who knowingly violate the law." *Walden*, 596 F.3d at 52.

While "the summary judgment standard requires absolute deference to the nonmovant's factual assertions (as long as those assertions are put forward on personal knowledge or otherwise documented by materials of evidentiary quality), . . . qualified immunity, when raised on summary judgment, demands deference to the reasonable, if mistaken, actions of the movant." *Morelli v. Webster*, 552 F.3d 12, 18–19 (1st Cir. 2009).  "In order to ease this inherent tension, we think it wise for courts to cabin these standards and keep them logically distinct, first identifying the version of events that best comports with the summary judgment standard and then asking whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." *Id*. at 19.  As explained in the previous section, there is no evidence in the record that Beaupre did anything unlawful.  If the Court does not agree with that conclusion, it should rule, at a minimum, that there is no evidence that Beaupre did anything that he *knew or should have known* was unlawful.

While Gaudette's underlying sexual abuse of Ouellette may have violated clearly established constitutional rights in a way that a reasonable person would have understood, there is no evidence of any conduct by Beaupre that did so.  There is no evidence that, at any relevant time, Beaupre did anything that a reasonable official in his position would have understood to violate clearly established law, or to suggest that Beaupre was plainly incompetent or knowingly violated the law.  Even setting aside the exacting requirements for the imposition of supervisory liability under section 1983—including the requirement that Beaupre should have done something that *led inexorably* or had a *strong causal connection* to Gaudette's underlying violation of Ouellette's constitutional rights (*see supra*)—there is no evidence in the record that Beaupre knew anything at all about Gaudette's alleged abuse of Ouellette when it happened.  That being so, there is no evidence to support a finding that Beaupre "would have understood that his conduct violated [Ouellette's] constitutional rights."  *Walden*, 596 F.3d at 52.

Since becoming the Biddeford Police Department chief in 1981, Chief Beaupre has received allegations of sexual abuse against three Biddeford Police Department officers: Stephen Dodd, Robert M. Devou, and Norman Gaudette.  SMF ¶ 69.  In each instance, Chief Beaupre has referred the complaint to either the York County District Attorney or the Maine Attorney General's Office in order to ensure that a third-party investigation was done to review the alleged sexual abuse by a current or former member of the Biddeford Police Department.  *Id*. ¶ 70.

Chief Beaupre first received information about alleged sexual misconduct by Biddeford Police Officer Stephen Dodd in 1989.  SMF ¶ 71.  Chief Beaupre directed that the information be given to the district attorney's officer and the Maine Department of Health and Human Services, which then notified the Maine State Police.  *Id*. ¶¶ 72-75.  By the time the ensuing investigation ended the allegations against Dodd had been recanted.  *Id*. ¶ 76.  In 2002 Chief Beaupre again

received information about alleged sexual misconduct by Dodd. *Id.* ¶ 77. Chief Beaupre had the matter referred to the Office of the Maine Attorney General, which conducted an investigation. *Id.* ¶¶ 78-81. Chief Beaupre welcomed and cooperated with the investigation. *Id.* ¶¶ 104-107. When the investigation concluded with a decision not to prosecute Dodd, Chief Beaupre worked successfully to end Dodd's law enforcement career. *Id.* ¶¶ 87-100. In 2014 Chief Beaupre was once again notified of sexual abuse allegations against Dodd, this time made by Matthew Lauzon. SMF ¶ 101. Even though Dodd was no longer an officer of the Biddeford Police Department, Chief Beaupre instructed Officer Keith Greenwood to refer the matter to the Attorney General's Office for further investigation. *Id.* ¶ 102.

In 2008 Chief Beaupre was made aware of an allegation of sexual abuse against retired Biddeford Police Officer Sergeant Robert M. Devou; he directed that the matter be referred to the Attorney General's Office for further investigation, which ultimately concluded there was not enough information to initiate a criminal investigation. SMF ¶¶ 109-112.

When Chief Beaupre was first advised that allegations of sexual abuse had been made against Gaudette he directed that they be shared with the Office of the York County District Attorney. *Id.* ¶¶ 114-115. The District Attorney's Office concluded that the complaint was not worth pursuing because the accuser was over 21 years old and was generally not believed to be credible. *Id.* ¶ 116. In 1990 Chief Beaupre received word of an allegation that Gaudette, while off duty, had sexually assaulted 16-year-old Ouellette. *Id.* ¶ 117-18. Chief Beaupre directed that the matter be referred to the District Attorney's Office, which in turn referred the matter to the Attorney General's Office for further investigation. *Id.* ¶¶ 119-120. At the request of the Attorney General's Office, Chief Beaupre assigned Biddeford Police Detectives Richard Gagne and Terry Davis to assist with the investigation. *Id.* ¶¶ 121-123. Beaupre placed Gaudette on

administrative leave pending the outcome of the Attorney General's investigation. *Id*. ¶ 124. Chief Beaupre cooperated with the investigation and did nothing to impede or obscure it. *Id*. ¶¶ 126-127.

The Attorney General's Office investigation into allegations of sexual abuse by Gaudette resulted in a presentation to the York County Grand Jury. *Id*. ¶¶ 129. A vote of "no bill" was returned by the Grand Jury. *Id*. ¶¶ 133. On the same day or shortly thereafter, Chief Beaupre learned that the Attorney General's Office was not able to persuade a grand jury to indict Gaudette on charges arising out of claims of sexual misconduct. *Id*. ¶¶ 134.

Chief Beaupre also ordered a separate Internal Affairs investigation into the allegations against Gaudette. *Id*. ¶¶ 135-144. After the investigation generated inconclusive results, Chief Beaupre determined that based on the information provided to him by the investigative officer, there was insufficient evidence to support two of the three allegations against Gaudette and no violation of any department regulations to support the charge of "abuse of authority". *Id*. ¶¶ 149-151.

After the Grand Jury process and the Internal Investigation processes were completed, Chief Beaupre consulted with the Attorney for the City of Biddeford to determine what alternatives were available to the department regarding Gaudette's future employment. *Id*. ¶ 153. Chief Beaupre was informed that he had no alternative but to reinstate Gaudette to his former position within the Biddeford Police Department. *Id*. ¶ 154.

Chief Beaupre also consulted the rules of the Maine Criminal Justice Academy Board of Trustees, the licensing authority for law enforcement officers in Maine, to determine whether Gaudette could be decertified based on the allegations made against him at the time; he was advised that he could not be decertified unless he was found guilty by a court of a felony or

misdemeanor crime involving moral turpitude. *Id*. ¶¶ 155-156. Having no other alternative, Chief Beaupre complied with the opinion of the City's Attorney. *Id*. ¶ 157. Thereafter, Chief Beaupre received no subsequent complaints concerning the alleged sexual abuse of minors by Gaudette. *Id*. ¶ 158.

In sum, every time Chief Beaupre learned about allegations of sexual abuse against police officers, he directed that they be referred to outside authorities for investigation. Ouellette never told Chief Beaupre that Gaudette had sexually abused him. *Id*. ¶¶ 65-68. Because there is no evidence that Chief Beaupre did anything that he could reasonably have understood to have violated Ouellette's constitutional rights, or that he knew or should have known was unlawful, he is entitled to qualified immunity.

### V. Conclusion

The Court should enter summary judgment in favor of Defendants Roger Beaupre and City of Biddeford on Ouellette's 42 U.S.C. § 1983 claims because they are barred by the statute of limitations; because the underlying conduct Ouellette alleges was not engaged in under color of state law; and because there is no evidence that the City Defendants did anything to violate Ouellette's constitutional rights. At a minimum, the Court should enter summary judgment in favor of Beaupre under the doctrine of qualified immunity.

DATED at Portland, Maine this 15th day of May 2019

/s/ Timothy J. Bryant_____
Timothy J. Bryant, Esq. (Bar No. 7736)
Attorney for Defendant, Roger Beaupre
Preti, Flaherty, Beliveau & Pachios, LLC
One City Center
P. O. Box 9546
Portland, ME  04112-9546

19

tbryant@preti.com
(207) 791-3000

/s/ Keith R. Jacques
Keith R. Jacques, Esq. (Bar #2962)
Attorney for Defendant, City of Biddeford
Woodman Edmands Danylik Austin Smith
& Jacques, P.A.
234 Main Street
P.O. Box 468
Biddeford, ME 04005
krj@woodedlaw.com
(207)  284-4581

20

14160293.1